[Cite as *Estate of Smith v. Western Brown Local School Dist.*, 2015-Ohio-154.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

| | | |
|---|---|---|
| ESTATE OF CHANCE R. SMITH, | : | |
| Plaintiff-Appellant, | : | CASE NO.  CA2014-06-012 |
| | : | O P I N I O N |
| - vs - | | 1/20/2015 |
| | : | |
| WESTERN BROWN LOCAL SCHOOL | : | |
| DISTRICT, et al., | | |
| | : | |
| Defendants-Appellees. | | |
| | : | |

CIVIL APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
Case No. 2013 CVH 0281

Becker & Cade, Dennis A. Becker, Richard G. Ellison, 526-A Wards Corner Road, Loveland, Ohio 45140, for plaintiff-appellant, Estate of Chance R. Smith

McCaslin, Imbus & McCaslin, Bernard W. Wharton, R. Gary Winters, 632 Vine Street, Suite 900, Cincinnati, Ohio 45202-2442, for defendants-appellees, Christopher Burrows, Heather Cooper and Dusty Gray

**PIPER, J.**

{¶ 1}  Plaintiff-appellant, the Estate of Chance R. Smith ("the Estate"), appeals the decision of the Brown County Court of Common Pleas granting summary judgment in a wrongful death action to defendants-appellees, Christopher Burrows, Heather Cooper, and Dusty Gray (collectively, "the defendants").

{¶ 2}  We construe the facts from the record, which includes deposition transcripts and the pleadings, in the light most favorable to the Estate because summary judgment was granted in favor of the defendants.  *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, ¶ 5.

{¶ 3}  The decedent, Chance Smith, was a sophomore at Western Brown High School during the 2011-2012 school year, and Chance's girlfriend, B.L., was a freshman. E.C., a male, was a classmate and acquaintance of B.L.

{¶ 4}  On Thursday, February 2, 2012, B.L. showed her homeroom teacher an anonymous note she found in her locker ("Note 1").  In addition to calling B.L. a series of vulgar names, Note 1 contained a threat to kill Chance and his family.[1]  The teacher immediately dispatched B.L. to the office to share the note with Assistant Principal Dusty Gray.  Assistant Principal Gray spoke with B.L. briefly, and took possession of Note 1.

{¶ 5}  After lunch, B.L. met with Principal Heather Cooper.  B.L. described the contents of Note 1 and vaguely referred to other, similar notes she found in her locker over the past several weeks, one of which appeared to be signed by E.C.  She also informed Principal Cooper of several disturbing text messages she purportedly received from another male student at the school, C.R.  Principal Cooper had B.L.'s locker combination changed, and sent her back to class.

{¶ 6}  At the end of the school day on Thursday, Chance stopped briefly at the school office to inform Principal Cooper that his cell phone had been stolen from B.L.'s locked locker.  At a school basketball game later that evening, Principal Cooper was standing with Christopher Burrows, the Superintendent of Western Brown Local School District, when

---

1. The full text of Note 1 read:

    Pregnet [sic] Bi*** You Dumb Cu** Cheating Bi***!  Come Fu** me! Or I'll
    Kill Chance + Chances [sic] family. I will tell everyone that you cheat on
    Chance you whore, I hope he gets molested again.

Chance and B.L. approached to inform Principal Cooper that B.L. had received a text message from Chance's phone after it had been stolen.

{¶ 7}   Around 8:00 a.m. the next morning, Friday, February 3, Chance and B.L. stopped in the office to inform Principal Cooper that B.L. had received a second message from Chance's stolen phone at approximately 10:00 p.m. the prior evening.

{¶ 8}   Given the threatening note, the reported theft of Chance's cell phone, and the subsequent text messages, Principal Cooper referred the two students down the hall to the school's resource officer, Officer Reggie McKenzie of the Mount Orab Police Department, so that he could follow-up on the information that been reported.  She also retrieved Note 1 from Assistant Principal Gray's office and gave it to Officer McKenzie for his review.  Officer McKenzie interviewed Chance and B.L. separately, took separate written statements, and completed incident reports.

{¶ 9}   After referring Chance and B.L. to Officer McKenzie, Principal Cooper spoke with E.C., who denied writing any of the threatening notes.  Principal Cooper also spoke with C.R. about the disturbing text messages B.L. reported he had sent.  C.R. admitted to sending the messages, but claimed he did so at Chance's request.  C.R. then showed Principal Cooper a text message he received from Chance's phone that instructed C.R. what to tell school officials if questioned about the messages he was sending to B.L.

{¶ 10} During the day on Friday, two other notes surfaced that were directed at B.L. Officer McKenzie observed that one note ("Note 2") was found at 10:45 a.m. and turned over to a teacher by another student, D.M.[2] The other ("Note 3") was found by Chance at around the same time.[3]  All three notes found on Thursday and Friday contained threats to kill

---

2.  The full text of Note 2 read:

> I heard you were taking people to the office [C.R.] Didn't do nothing [sic] I
> will kill you Chance.

3.  The full text of Note 3 read:

Chance, and appeared to Officer McKenzie to be from the same notepad and written in the same handwriting.

{¶ 11} Superintendent Burrows was at the school at some point during the day on Friday, and was generally aware of "some notes that were flying around the building," and "that it was kind of a mystery what was going on with [the notes]." However, he was not aware of the details, and he was not involved in efforts to gather additional information.

{¶ 12} Also during the day on Friday, Assistant Principal Gray received a call from E.C.'s mother. E.C.'s mother indicated that E.C. was "very upset," and insisted that E.C. had not written the notes. After her call with E.C.'s mother, Assistant Principal Gray perceived a situation that involved "you know, two boys after the same girl."

{¶ 13} After school on Friday, Principal Cooper, Officer McKenzie, and a teacher familiar with the situation had a conversation about Notes 1, 2, and 3. By the end of the conversation, Principal Cooper and Officer McKenzie shared the suspicion that Chance was the author of all three of the notes. Principal Cooper did not contact anyone's parents at that time because she "needed to know more * * * of everything going on," and believed that if Officer McKenzie felt anyone was in imminent danger he would have acted accordingly.

{¶ 14} On Monday morning, February 6, Principal Cooper spoke with D.M., the student who found Note 2. D.M. admitted that he had seen Chance writing one of the notes, and corroborated his admission by identifying one of the vulgar names B.L. had been called in Note 1. D.M. also informed Principal Cooper that Chance told him that he – Chance – was writing the notes to draw B.L. closer to him. It appears on Monday morning school officials confirmed their earlier suspicion that Chance was behind the notes due to what he thought was a rivalry over his girlfriend.

---

Hey I hope you know I'm going to get Chance in trouble cause [sic] I was
texting [C.R.] acting like him so don't say nothing or I will kill Chance.

{¶ 15} Around the same time Principal Cooper was speaking with D.M., Assistant Principal Gray received another call from E.C.'s mother. E.C.'s mother informed Assistant Principal Gray that she and E.C. had a phone conversation with Chance the previous night (Sunday, February 5), and she expressed concern because Chance was "talking really stupid." E.C.'s mother indicated E.C. would be able to provide Assistant Principal Gray with more of the details. As the parties were ending the conversation, E.C.'s mother recalled saying to Assistant Principal Gray, "no matter what Chance has done we do not want him to hurt himself. And [E.C.] is worried that he's going to kill himself." Assistant Principal Gray then had a brief conversation with E.C., but left it to Principal Cooper to talk with him at greater length.

{¶ 16} At lunchtime on Monday, Principal Cooper spoke with E.C. E.C. showed her multiple threatening text messages he said he had received from Chance in recent months, he believed due to his acquaintance with B.L. E.C. also described the bizarre phone conversation he had with Chance the previous night (some of which E.C.'s mother was a party to). Principal Cooper then followed-up with Assistant Principal Gray, who confirmed that her conversation with E.C.'s mother was consistent with what E.C. told Principal Cooper.

{¶ 17} Shortly after lunch, Principal Cooper learned that Chance had dropped B.L. off at school that morning, but Chance was not at school because he said he had a doctor's appointment. Sometime after 2:00 p.m., Principal Cooper attempted to contact Chance's mother, Michelle Smith, but the phone continued to ring and failed to connect to a voicemail service. School was ending, so Principal Cooper's responsibilities required that she attend to bus duty.

{¶ 18} When she returned from bus duty, Principal Cooper located a work number for Mrs. Smith. The call went through, and Principal Cooper spoke directly with Mrs. Smith. During this conversation, Principal Cooper told Mrs. Smith that Chance was not at school,

that he had "some issues" with E.C., that he was suspected of writing threatening notes, and that he had said bizarre things to E.C. and E.C.'s mother, such as threatening to kill E.C. and then himself. However, Mrs. Smith testified that she "can't recall exactly * * * what [Principal Cooper] said." Mrs. Smith assured Principal Cooper that she would speak with Chance to "get to the bottom of it."

{¶ 19} After speaking with Mrs. Smith, Principal Cooper called Superintendent Burrows to inform him of the notes to B.L. and the situation with Chance.

{¶ 20} Chance did not, in fact, have a doctor's appointment on Monday. Thus, after speaking with Principal Cooper, Mrs. Smith called Chance on his cell phone to find out why he was not at school and where he was. Chance answered his phone, and informed her he was at a friend's house. Mrs. Smith told him that she had spoken with Principal Cooper, and asked what was going on between Chance and E.C. It was concluded they would discuss the situation when she and Chance's father, Burley Smith, returned home from work later that evening. Mrs. Smith recalled that the call lasted "maybe two to three minutes," and "Chance was fine" when they spoke.

{¶ 21} Mr. Smith arrived home from work at approximately 7:30 p.m. on Monday evening, and Mrs. Smith arrived home shortly thereafter. Although Chance's vehicle was in the driveway, he was not in the house and did not respond to either Mr. or Mrs. Smith's calls to his cell phone. Mrs. Smith drove to the houses of several of Chance's friends, but no one knew where he might be. The Smiths continued their efforts to find or contact Chance throughout the night, but were unsuccessful.

{¶ 22} On Tuesday morning, February 7, Principal Cooper and Superintendent Burrows had a further phone conversation to discuss a plan of action for Chance. The two agreed that rather than disciplining Chance, he should be referred for a mental health evaluation and placed in their virtual learning program.

{¶ 23} At some point during Tuesday morning, Principal Cooper learned that Chance was not present for school, and again tried to call Mrs. Smith. As had happened the day before, she was unable to reach Mrs. Smith at her primary phone number, and was not able to leave a voicemail message. B.L. claimed that she had not heard from Chance Tuesday morning, and that he had not responded to her text messages the evening before, so Principal Cooper then tried the phone number on file for Chance's father. Mrs. Smith answered the phone, and informed Principal Cooper that Chance did not return home on Monday evening, and that they still could not find him. When Principal Cooper called back later that morning, Mrs. Smith informed her that they had located Chance's body, and that he was deceased. The subsequent autopsy confirmed that Chance had taken his own life.

{¶ 24} In April 2013, the Estate filed a wrongful death action against Western Brown Local Schools, Superintendent Burrows, Principal Cooper, Assistant Principal Gray, and the teacher to whom B.L. first reported Note 1. Eventually, the Estate voluntarily dismissed its claims against the teacher and against Western Brown Local Schools, and the action proceeded with Superintendent Burrows, Principal Cooper, and Assistant Principal Gray as the defendants.

{¶ 25} In March 2014, the defendants filed a motion for summary judgment, and attached the depositions of all three of the defendants, along with those of Mr. and Mrs. Smith, B.L., E.C.'s mother, and the Estate's expert witness, Professor Deanna Wilkinson. At the same time, they also filed a motion to strike the deposition testimony of Professor Wilkinson and exclude her from being a witness in the case. In April 2014, the Estate responded with two memoranda in opposition to the defendants' respective motions. On May 28, 2014, the trial court granted both of the defendants' motions.

{¶ 26} The Estate now appeals, raising two assignments of error.

{¶ 27} Assignment of Error No. 1:

{¶ 28} THE TRIAL COURT ERRED IN STRIKING THE DEPOSITION TESTIMONY OF PROFESSOR DEANNA WILKINSON.

{¶ 29} In a letter summarizing her professional opinion on the events leading up to Chance's death, Professor Deanna Wilkinson identified herself as "an expert on adolescent development/violence prevention and a researcher who has examined the implementation of the Ohio Anti-Harassment, Intimidation, and Bullying model policy." The defendants argued below that Professor Wilkinson's deposition testimony should be stricken from the record for purposes of summary judgment, and that she should be excluded from being a witness in the case. They contended her opinion was neither relevant nor reliable.

{¶ 30} In response, the Estate argued that Professor Wilkinson is a qualified expert, and that her opinion ought to be allowed at trial because, "[i]n the present instance, the identification of [the defendants'] duty is beyond the understanding or knowledge of a typical lay juror." In addition, the Estate relied upon Professor Wilkinson's opinion letter and her deposition testimony as a basis for contesting the defendants' motion for summary judgment.

{¶ 31} In its decision regarding the defendants' respective motions, the trial court began its analysis with a decision on the defendants' motion to strike due to the impact that issue would have on its summary judgment decision. The trial court struck Professor Wilkinson's letter and deposition testimony due to her lack of background, training, or experience with the issues in the case. In so doing, the trial court pointed out that Professor Wilkinson "demonstrated no reliable scientific, technical or other specialized information about suicide or suicide prevention." The court noted the Estate was "attempting to bootstrap" Professor Wilkinson's expertise in anti-bullying policies into expertise in suicide and suicide prevention, and found a "leap in logic" in her opinion that the defendants' alleged noncompliance with the school's anti-bullying policies somehow contributed to Chance's suicide.

{¶ 32} On appeal, the Estate argues the trial court abused its discretion when it struck Professor Wilkinson's letter and deposition testimony for use in opposing the defendants' motion for summary judgment. While the Estate concedes that Professor Wilkinson is not an expert in suicide prevention, it asserts that her opinion as an expert in the field of Harassment, Intimidation, and Bullying ("HIB") procedures and policies would assist the trier of fact in determining whether the defendants had a duty to notify Chance's parents of the threatening notes, and in discerning whether the defendants acted recklessly or wantonly.

**1. Standard of Review**

{¶ 33} Trial courts have broad discretion in determining the admissibility of expert testimony. *Battelle Mem. Inst. v. Big Darby Creek Shooting Range*, 192 Ohio App.3d 287, 2011-Ohio-793, ¶ 27 (12th Dist.), citing *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, ¶ 16. So long as the court's discretion is exercised in line with the rules of procedure and evidence, its judgment will not be reversed absent a clear showing of an abuse of discretion with attendant material prejudice to a party. *Theurer v. Foster-Theurer,* 12th Dist. Warren Nos. CA2008-06-074 and CA2008-06-083, 2009-Ohio-1457, ¶ 24. "Abuse of discretion" suggests unreasonableness, arbitrariness, or unconscionability. *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶ 9.

**2. Admissibility of Expert Testimony**

{¶ 34} In general, courts should admit expert testimony where it is relevant, material and satisfies all of the requirements of Evid.R. 702. *Batelle Mem. Inst.* at ¶ 27. Evid.R. 702 requires:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

This rule vests the trial court with a "gatekeeping function" which obliges the court "to assess both the reliability of an expert's methodology and the relevance of any testimony offered before permitting the expert to testify." *Terry*, 115 Ohio St.3d 351 at ¶ 24.

{¶ 35} To be sure, Professor Wilkinson has impressive academic credentials. She is an Associate Professor and the Associate Chair for Outreach and Engagement in the Department of Human Sciences at The Ohio State University. She obtained a Master's Degree in Criminal Justice from the University of Illinois at Chicago in 1992, and a Ph.D. in Criminal Justice from Rutgers in 1998. Since that time, she has earned numerous awards and honors, published a multitude of peer-reviewed articles and scholarly chapters in her field, and served as the principal investigator for the Ohio Bullying Prevention Project ("OBPP") in 2011 and the OBPP follow-up study in 2013.

{¶ 36} Nevertheless, a careful examination of the record raises significant questions about whether Professor Wilkinson's deposition testimony satisfied the requirements of Evid.R. 702, and about the relevance of her expertise in HIB policies and procedures.

{¶ 37} To begin with, it is not clear that Professor Wilkinson possessed expertise "beyond the knowledge or experience possessed by lay persons" with respect to the defendants' duty to notify parents of the threatening notes. Evid.R. 702(A) and (B). Professor Wilkinson's description of her role as principal investigator for the OBPP in 2011, and the follow-up study in 2013, is insufficient to establish that she possessed the requisite expertise. The OBPP was simply a survey of Ohio schools, administered online and by telephone, "to get an assessment of whether or not they were complying with the [HIB] Model Policy * * * [and] what schools [sic] needs were in terms of finding out the policy, [and] implementing it * * *." The OBPP did not examine the responsibilities of school officials in the

HIB Model Policy or in particular HIB situations (such as the discovery of threatening notes); it did not evaluate the effectiveness of the HIB Model Policy in preventing HIB behaviors; and, perhaps most relevant here, it did not explore or link the effects of the HIB Model Policy and the likelihood of student suicide.

{¶ 38} Professor Wilkinson's account of her work outside of the OBPP survey is also insufficient to establish that she possessed the requisite expertise. She explained that her research has been almost exclusively focused on community policing, decision making among inner city adolescent males, and "contributing to theory and * * * the knowledge base of * * * the pecking order of what happens on the street and how boys are socialized into this, particularly inner-city boys * * *." In fact, when asked to describe how she became involved in the OBPP, Professor Wilkinson admitted that "[i]t's not particularly my area."

{¶ 39} Additionally, Professor Wilkinson's deposition testimony raised significant questions about whether she possessed the requisite "specialized knowledge, skill, experience, training, or education" to offer expert testimony regarding the extent to which the defendants' conduct was wanton or reckless. Evid.R. 702(B). For instance, when asked whether "wanton misconduct" was a term that she had ever used before in her work, Professor Wilkinson responded "[n]o, not really," and indicated she used the term mainly because counsel for the Estate had informed her that it would be the "standard of proof" in the case. Further, to the extent that Professor Wilkinson understood the import of the phrase "wanton misconduct," she stated that her understanding was based on an email from the Estate's counsel, a definition she found on Wikipedia, and criminal justice courses she took in graduate school over a decade ago.

{¶ 40} Lastly, the relevance of Professor Wilkinson's expertise in HIB policies and procedures to the issues surrounding Chance's suicide appears nonexistent. An expert's testimony is relevant if "it logically advances a material aspect of the proposing party's case."

*Terry*, 115 Ohio St.3d 351 at ¶ 26, quoting *Valentine v. PPG Industries, Inc.*, 158 Ohio App.3d 615, 2004-Ohio-4521 (4th Dist.). In an effort to make the subject matter of HIB relevant, the Estate characterizes the notes found at school as threatening to Chance, and thus as creating a duty for the defendants to immediately involve Chance's parents. Yet, however unfortunate, it rapidly appeared that Chance was the author of the notes, pretending to be threatened as part of a ruse to draw B.L. closer to him. Therefore, the notes did not reflect a situation involving HIB behaviors directed at Chance, but rather his own machinations to secure the affection of his girlfriend.[4]

{¶ 41} Given Professor Wilkinson's relative unfamiliarity with the subject matter central to the issues involved, we do not find the court abused its discretion in determining Professor Wilkinson lacked sufficient background, training, or experience to qualify her as an expert regarding Chance's suicide. We are unconvinced that the proposed expert satisfied the requirements of Evid.R. 702, and that her testimony was sufficiently developed to be relevant. Being mindful of the deferential standard of review as applied to the facts and circumstances sub judice, we do not find that the trial court's decision was unreasonable, arbitrary, or unconscionable. Thus, the trial court did not abuse its discretion in striking Professor Wilkinson's deposition testimony.

{¶ 42} The Estate's first assignment of error is overruled.

{¶ 43} Assignment of Error No. 2:

{¶ 44} THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS, COOPER, GRAY AND BURROWS [SIC].

{¶ 45} In its decision granting summary judgment to the defendants, the trial court found the relationship between the defendants and Chance to be "analogous to one who

---

4. The ruse appears to have been designed with the dual purpose of securing the affection of B.L., and distancing her from E.C. While E.C. and B.L. may have been harassed by the ruse, Chance was not.

- 12 -

stands in loco parentis, with the result that a school is under a special duty to exercise reasonable care to protect a pupil from harm." Hence, the trial court held that "School Boards, Administrators, Teachers, Counselors, Coaches, School Resource Officers and any other employee who has [sic] knowledge of a threat of suicide by a student has the duty to notify the child's parents of the threat." Nevertheless, the trial court concluded that the defendants were entitled to summary judgment because they discharged any existing duties by investigating the notes and by contacting Mrs. Smith upon learning of Chance's threat to kill E.C. and then kill himself.

{¶ 46} The Estate argues the trial court erred by granting summary judgment to the defendants because there existed genuine issues of material fact to be resolved at trial. In particular, the Estate contends the record shows that by noon on Friday, February 3, the defendants were aware of a great probability of harm arising from the situation involving Chance, B.L., and E.C., or that a known or obvious risk of harm was evident. In other words, the Estate contends there is a genuine issue of material fact as to whether the defendants had a duty to contact the Smith family before Monday, February 6. In addition, the Estate asserts there is a dispute of fact as to whether Principal Cooper actually informed Mrs. Smith of Chance's threat to kill E.C. and then kill himself during their Monday phone conversation.

**1. Standard of Review**

{¶ 47} Appellate review of a trial court's decision granting summary judgment is de novo. *Roberts v. RMB Ents., Inc.,* 197 Ohio App.3d 435, 2011-Ohio-6223, ¶ 6 (12th Dist.). In applying the de novo standard, the appellate court is required to use the same standard the trial court should have used, and examine the evidence to determine whether, as a matter of law, no genuine issues exist for trial. *Deutsch v. Birk*, 189 Ohio App.3d 129, 2010-Ohio-3564, ¶ 7 (12th Dist.). Under Civ.R. 56(C), summary judgment is appropriate when (1) there are no genuine issues of material fact to be litigated, (2) the moving party is entitled to

judgment as a matter of law, and (3) when all evidence is construed most strongly in favor of the nonmoving party, reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-70 (1998).

## 2. The Defendants' Duty of Care

{¶ 48} To maintain a wrongful death action on a theory of negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death. *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St.3d 86, 92 (1988). The threshold question of the existence of a duty in a negligence action is a question of law for the court to determine. *Profitt v. Tate Monroe Water Assn., Inc.*, 12th Dist. Clermont No. CA2012-10-072, 2013-Ohio-2278, ¶ 19; *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989).

{¶ 49} Despite the trial court's determination regarding the existence of a special duty in the present case, there is no controlling authority which holds that school officials stand "in loco parentis" to their students, and are therefore bound by "a special duty to exercise reasonable care." Indeed, it is well settled Ohio law that school officials are bound only under the common law to exercise that care necessary to avoid reasonably foreseeable injuries to their students, unless a more specific obligation is assumed. *Nottingham v. Akron Bd. of Edn.*, 81 Ohio App.3d 319, 322 (9th Dist.1992); *see also Golden v. Milford Exempted Vill. Sch. Dist. Bd. of Edn.*, 12th Dist. Clermont No. CA2010-11-092, 2011-Ohio-5355, ¶ 40.

{¶ 50} The test for foreseeability of an injury "is whether a reasonably prudent person, under the same or similar circumstances as the defendant, should have anticipated that injury to the plaintiff or to those in like situations is the probable result of the performance or nonperformance of an act." *Commerce & Industry Ins. Co. v. Toledo*, 45 Ohio St.3d 96, 98 (1989). In determining whether the defendant should have anticipated the injury, only those

circumstances which the defendant perceived, or should have perceived, at the time of his respective actions should be considered. *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77 (1984).

{¶ 51} School officials acted quickly and efficiently to gather information about the three notes to B.L. discovered on Thursday and Friday morning. By Friday afternoon, school officials had formulated the suspicion that Chance was the author of the notes, and that the notes were part of a ruse to "draw B.L. closer" to Chance. At that time, Chance had not exhibited any signs of suicide, Chance's threatening text messages to E.C. over B.L. were unknown to school officials, and his threat to kill E.C. and then himself had yet to occur. In these circumstances, no reasonably prudent person would have, or should have, anticipated Chance's suicide.

{¶ 52} Therefore, we disagree with the Estate's contention that the defendants had a duty to inform Mr. and Mrs. Smith of the situation involving Chance, B.L., and E.C. on either Thursday or Friday.

{¶ 53} Further, the Estate tries to create a question of fact by contending that Principal Cooper never told Mrs. Smith that Chance threatened to kill E.C. and then kill himself. However, when school officials learned on Monday of Chance's threats, he was not under their care, custody, or control, and their information came only through hearsay. Moreover, neither Chance's family nor school officials had any reason to believe that Chance would actually harm himself. E.C. was at school, so it was apparent Chance had not acted on his statement (i.e., that he would kill E.C. and then himself), and Mrs. Smith's contact with Chance did not establish need for alarm. Even on Monday, no reasonably prudent person would have, or should have, anticipated that Chance's suicide was a probable or likely end result.

{¶ 54} Thus, although the standard of reasonable care to which we hold the

defendants in our de novo review is different than the heightened duty imposed by the trial court, we reach the same result.

### 3. Immunity of Political Subdivision Employees

{¶ 55} Finally, it is undisputed that the alleged acts or omissions of the defendants occurred within the scope of their employment for a political subdivision that performs a government function. R.C. 2744.01(C) and (F) (identifying public education as a government function, and including school districts within the definition of a political subdivision). Therefore, regardless of our conclusions with respect to the duty owed to Chance, our de novo review requires that we examine whether the defendants are entitled to immunity from tort liability pursuant to R.C. 2744.03.

{¶ 56} R.C. 2744.03(A)(6)(b) provides that an employee of a political subdivision is immune from tort liability unless "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Hence, the defendants are immune from liability in this action unless the Estate can show that one of the exceptions to immunity identified in R.C. 2744.03(A)(6)(b) applies. *Golden*, 2011-Ohio-5355 at ¶ 35. Although the Estate alleges that the defendants' acts or omissions amounted to "wanton and/or reckless misconduct," they have failed to show that an exception to immunity applies.

{¶ 57} The Ohio Supreme Court recently clarified the definitions of "wanton misconduct" and "reckless conduct" in the context of the immunity of political subdivision employees:

> Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result. * * *
>
> Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.

(Citations omitted.) *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, ¶ 33-34;

*see also J.H. v. Hamilton City Sch. Dist.*, 12th Dist. Butler No. CA2012-11-236, 2013-Ohio-2967, ¶ 20.

{¶ 58} Demonstrating either "wantonness" or "recklessness" is subject to a high standard. *Fields v. Talawanda Bd. of Edn.*, 12th Dist. Butler No. CA2008-02-035, 2009-Ohio-431, ¶ 16, citing *Rankin v. Cuyahoga Cty. Dept. of Children and Family Servs.*, 118 Ohio St.3d 392, 2008-Ohio-2567, ¶ 37. Thus, although the determination of wantonness or recklessness is typically within the province of the jury, summary judgment is appropriate in instances where the individuals' conduct does not demonstrate a disposition to perversity. *Fields* at ¶ 16, citing *O'Toole*, 118 Ohio St.3d at ¶ 75; *see also Fabrey v. McDonald Vill. Police Dept.*, 70 Ohio St.3d 351, 356 (1994).

{¶ 59} Although Chance's death was tragic and an immense loss, that tragedy does not mean the standard for showing wantonness or recklessness is any less. "We must apply the law without consideration of emotional ramifications and without the benefit of 20-20 hindsight." *O'Toole* at ¶ 76. We conclude that, in construing the facts most strongly in favor of the Estate, reasonable minds can come to only one conclusion: that there is no evidence the defendants acted in a wanton or reckless manner.

{¶ 60} The defendants' conduct was not wanton or reckless because they did not fail to exercise care in regard to Chance, and their conduct was not a conscious disregard of, or indifference to, a known or obvious risk of harm to Chance. To the contrary, they went to great lengths to gather information, assess the nature of the threats contained in the notes, and ultimately to contact Chance's parents.

{¶ 61} Upon learning of the threatening note found in B.L.'s locker on Thursday, February 2, Principal Cooper immediately began to gather additional information to identify the source of the note and determine whether there was a real threat to Chance or B.L. She was aided in this effort by Assistant Principal Gray, who spoke with B.L., took possession of

Note 1, conversed twice by phone with E.C.'s mother, followed up on both occasions with E.C. himself, and relayed relevant information to Principal Cooper when necessary.

{¶ 62} By the end of the day on Friday, February 3, school officials had interviewed several students, and Principal Cooper had formulated the suspicion – shared by Officer McKenzie – that Chance had authored the notes. Thus, Principal Cooper could not reasonably believe that the notes, instigated by Chance to secure the attention of his girlfriend, constituted a real threat that Chance would hurt himself or his girlfriend, B.L. Superintendent Burrows was generally aware of "some notes that were flying around the building" on Friday, but he was not aware of any significant details. He did not seek additional details because he was not the school official responsible for immediately responding to such situations. He was aware that school officials responsible for the day-to-day operation of the school, and students, were responding.

{¶ 63} When Principal Cooper and Assistant Principal Gray learned, during the course of the day on Monday, that Chance had purportedly threatened to kill E.C. and then kill himself, additional action was immediately taken. Despite the fact that Chance had not been on school premises in over 48 hours, and that the threat was made off school premises and not during school hours, Principal Cooper took steps to contact Chance's parents in short order so they could engage Chance and take any action necessary. When Superintendent Burrows learned the details of the situation, Principal Cooper had already called Mrs. Smith to bring the matter to the family's attention.

{¶ 64} We note that the Estate asserts Mrs. Smith "specifically denies" being told by Principal Cooper, during their Monday phone conversation, that Chance had threatened to kill E.C. and then kill himself. However, there is no such specific denial in the record. Principal Cooper's deposition testimony establishes that she *did* inform Mrs. Smith of Chance's threat to kill E.C. and then himself. Mrs. Smith's deposition testimony reveals only that Mrs. Smith

cannot "recall" exactly what Principal Cooper told her. Not recalling specific facts only means the person does not remember the facts presented to her, it does not mean that the facts were not presented. While Mrs. Smith specifically denies being told that Chance was "suicidal," that is not a denial of the information Principal Cooper reported to Mrs. Smith. Principal Cooper did not opine that Chance was actually suicidal, and never represented she informed Mrs. Smith of such an opinion.

{¶ 65} In short, the Estate has failed to show that the defendants acted in a wanton or reckless manner. Thus, the defendants are entitled to the immunity from tort liability generally applied to employees of a political subdivision pursuant to R.C. 2744.03.

{¶ 66} For the foregoing reasons, the Estate's second assignment of error is overruled.

{¶ 67} Judgment affirmed.

RINGLAND, P.J., and HENDRICKSON, J., concur.