[Cite as *Nationwide Agribusiness Ins. Co. v. Heidler*, 2019-Ohio-4311.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

| | | |
|---|---|---|
| NATIONWIDE AGRIBUSINESS INSURANCE COMPANY, et al., | : | CASE NOS. CA2018-06-003 |
| | : | CA2018-07-004 |
| Appellants/Cross-Appellees, | | CA2018-09-012 |
| | : | CA2018-09-015 |
| - vs - | : | O P I N I O N |
| | | 10/21/2019 |
| | : | |
| JONATHAN W. HEIDLER, et al., | : | |
| Appellees/Cross-Appellants. | : | |
| | : | |

CIVIL APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
Case Nos. CVH 20140532 & CVH 16000190

Subashi, Wildermuth & Justice, Nicholas E. Subashi, Tabitha Justice, Jerome Rolfes, The Greene Town Center, 5 Chestnut Street, Suite 230, Dayton, Ohio 45440, for appellants/cross-appellees, Nationwide Agribusiness Insurance Company and Nationwide Mutual Fire Insurance Company

Lane Alton, Gregory D. Rankin, Thomas J. Keener, Eric S. Bravo, Two Miranova Place, Suite 220, Columbus, Ohio 43215, for appellees/cross-appellants Jonathan W. Heidler and Terri Jo Heidler

Dave Yost, Ohio Attorney General, Hilary R. Damaser, Jahan S. Karamali, Assistant Attorneys General, Executive Agencies Section, 30 East Broad Street, 26th Floor, Columbus, Ohio 43215, for appellee, State Fire Marshal

Kemp, Schaeffer & Rowe Co., L.P.A., Michael N. Schaeffer, Richard G. Murray II, Scott N. Schaeffer, 88 W. Mound Street, Columbus, Ohio 43215, for appellee, Wilmington Savings Bank

Cincinnati Insurance Company, Daniel G. Taylor, Michael M. Neltner, 140 East Town Street, Suite 1015, Columbus, Ohio 43215, for plaintiff/intervenor, Cincinnati Insurance Company

**S. POWELL, J.**

{¶ 1} Appellants/cross-appellees, Nationwide Agribusiness Insurance Company and Nationwide Mutual Fire Insurance Company ("Nationwide"), and appellees/cross-appellants, Jonathan W. Heidler and Terri Jo Heidler (collectively, the "Heidlers"), appeal from a judgment entered in the Clinton County Court of Common Pleas in this declaratory judgment action arising out of Nationwide's denial of insurance coverage to the Heidlers for damage caused by a fire to the Heidlers' property located in Washington Court House, Ohio.[1]  For the reasons outlined below, we dismiss the appeal with respect to Nationwide's first assignment of error for lack of a final appealable order and reverse and remand on Nationwide's second assignment of error so that the trial court may provide its basis for the amount of attorney fees awarded to the Heidlers.  Nationwide's five "conditional" cross-assignments of error are also dismissed as this court's decision renders those conditioned cross-assignments of error moot.  In all other respects, the trial court's judgment is affirmed.

**The Insurance Policies**

{¶ 2} The Heidlers own property located at 259 Plano Road in Washington Court House, Ohio.  There is no dispute that Nationwide had issued a farmowners insurance

---

1. Plaintiff/intervenor, The Cincinnati Insurance Company, was permitted to join this action as an intervening plaintiff and bring claims against Nationwide and appellee, Wilmington Savings Bank.  The Cincinnati Insurance Company, however, is not a party to this appeal having resolved their dispute with Nationwide and Wilmington Savings Bank after this appeal was filed.

policy to Mr. Heidler that insured the Plano Road property. There is also no dispute that Nationwide had issued an automobile insurance policy to Mr. Heidler that insured his vehicle. It is also undisputed that the Plano Road property was mortgaged to appellee, Wilmington Savings Bank, and subject to two mortgages that totaled over $1,000,000. The record indicates that the farmowners insurance policy includes $595,400 in coverage for the Heidlers' home and $416,780 in personal property coverage. Both insurance policies contained provisions that excluded coverage for losses that were caused purposely with the intent to cause the loss.

### The Fire on the Heidlers' Property

{¶ 3} During the early morning hours of May 6, 2014, a fire destroyed the Heidlers' home located on their Plano Road property. The fire also destroyed Mr. Heidler's vehicle. Pursuant to the two insurance policies discussed above, the Heidlers' submitted a claim to Nationwide alleging losses resulting from the fire totaling over $1,000,000. Several months later, on November 12, 2014, Nationwide filed a complaint seeking a declaratory judgment finding the losses caused to the Heidlers' home and Mr. Heidler's vehicle were not "covered" losses under either insurance policy. Nationwide also alleged a breach of contract claim. The complaint named both the Heidlers and Wilmington Savings Bank as defendants.[2] The following is a summary of the facts alleged in Nationwide's complaint.

### Facts Alleged in Nationwide's Complaint

{¶ 4} After receiving notice of the fire, Nationwide began a claim investigation to determine its potential liability under the two insurance policies at issue. In the course of

---

2. Individual cases involving Mr. Heidler and Mrs. Heidler were consolidated by the trial court via an agreed entry on July 29, 2016. Therefore, although Nationwide's complaint filed on November 12, 2014 named only Mr. Heidler as a defendant, this court will nevertheless refer to the complaint as if it named to both Mr. and Mrs. Heidler for ease of discussion.

this investigation, Nationwide learned that an individual named Ronald Howland had been living in a tack room in a barn on the Heidlers' property. Howland was an alleged employee of the Heidlers who had moved into the barn only a few weeks prior to the fire that destroyed the Heidlers' home. Nationwide's complaint further alleged that Mr. Heidler had known Howland for nearly 20 years and "knew that Howland had been in prison for theft-related misconduct on more than one occasion."

{¶ 5} Nationwide alleged that Howland had told investigators that he woke up to the sound of breaking glass and observed flames coming through the roof of the Heidlers' home. Nationwide alleged that Howland, upon seeing the Heidlers' home on fire, made his way to a neighboring home where Mr. Heidler's parents resided on the Plano Road property. Once there, Mr. Heidler's parents called 9-1-1. The fire department was then dispatched to the scene. The fire, however, had by that time completely engulfed the Heidlers' home destroying both the home and all of its contents within. The fire also destroyed Mr. Heidler's vehicle.

{¶ 6} The Heidler family was not at home at the time of the fire. Rather, as alleged by Nationwide in its complaint, the Heidlers' were out of town on an "anniversary trip" in Tennessee. Prior to leaving for this trip, Mr. Heidler had instructed Howland to refinish the hardwood floors in the Heidlers' home. This required the use of multiple flammable liquids, which Nationwide claimed "provided a viable explanation for why such chemicals were present in the Heidler residence at the time of the fire." Howland, however, had completed refinishing the hardwood floors several hours before the fire started. Howland had also shut off and unplugged any heaters used to dry the newly refinished floor. Therefore, according to Nationwide's complaint, Howland "has been unable to offer any explanation for how the fire could have started."

- 4 -

**{¶ 7}** Nationwide's claim investigation included the hiring of a certified fire investigator, Thomas Bensen, to determine the cause and origin of the fire. Nationwide alleged that it had also reviewed documents, including financial records, income tax returns, bank records, and cell phone records, as well as interviewed several individuals with potential knowledge of the fire as part of its claim investigation. This included Mr. Heidler. Following the conclusion of its claim investigation, and upon receiving a report from Bensen outlining his findings regarding the cause and origin of the fire, Nationwide concluded that the fire had been intentionally set by Howland.

**{¶ 8}** As alleged by Nationwide in its complaint, this was because:

> (1) There were two "points of origin" for the fire, one in the living room area where the floors were being refinished and one in the bedroom area where items related to the refinishing were being stored. According to Nationwide's complaint, this is known to be "suspicious" in the context of fire investigations "because it shows that there were two separate fires that occurred at approximately the same time, indicating that the fire was set deliberately;"
>
> (2) There was a distinctive "pour pattern" on the floor where the fire originated. This, as Nationwide alleged, indicates that an "accelerant" was used to start the fire; and
>
> (3) The accelerant or flammable liquid that was used to start the fire caused "unusual fire damage below the sub-floor of the property, which could not be explained by the refinishing process."

**{¶ 9}** Nationwide also alleged the following in regard to the Heidlers' potential motive for setting fire to their home:

> (1) The Heidlers' home and many of the rental properties Mr. Heidler owned were "substantially mortgaged;"
>
> (2) Mr. Heidler's income from the rental properties "appears to have been equal to or less than his monthly expenses;"
>
> (3) Financial and banking records indicate that the Heidlers

"may have been living beyond their means, had little to no cash on hand, and/or were often overdrawn on their accounts;" and

(4) Mr. Heidler's admission that he was "behind on his payments to the mortgage company and that he was in a 'workout' arrangement with the bank."

{¶ 10} Nationwide further alleged the following in regard to several strange events leading up to the fire:

(1) Mr. Heidler had recently "auctioned off his prized collection of 'uninsured' guns in advance of the fire;"

(2) Mr. Heidler had also held a large garage sale just before the fire that raised more than $3,000; and

(3) Mr. Heidler had discontinued services from the previously operational working fire and security alarm system on the property.

{¶ 11} This was in addition to the fact that Mr. Heidler had been involved in a number of other fires and insurance claims prior to the fire at issue. Specifically, as Nationwide alleged in its complaint:

[Mr. Heidler] has an extensive record or history of numerous fires and insurance claims over the last 15 years, including a "total loss" insurance claim in 2004. In the 2004 incident, the residential dwelling and the nearby barn structures on the same piece of property at 259 Plano Road were completely destroyed in a fire. A prior insurance company fully compensated [Mr. Heidler] for that loss.

**Proceedings After Nationwide's Filed its Complaint**

{¶ 12} On December 22, 2014, the Heidlers filed an answer and counterclaim against Nationwide alleging a breach of contract and a breach of the duty to act in good faith.[3] The Heidlers also alleged that Nationwide had engaged in conduct that resulted in

---

3. Mrs. Heidler filed a complaint against Nationwide also alleging a breach of contract and a breach of the duty to act in good faith on May 2, 2016. However, as noted above in fn. 3, that case was later consolidated by the trial court with the case involving Mr. Heidler via an agreed entry on July 29, 2016.

"spoliation of evidence." Approximately three weeks later, on January 16, 2015, Wilmington Savings Bank also filed an answer and counterclaim against Nationwide. Similar to the counterclaim brought by the Heidlers, Wilmington Savings Bank also alleged claims of a breach of contract and breach of the duty to act in good faith against Nationwide. Wilmington Savings Bank additionally sought a declaratory judgment from the trial court finding it was entitled to compensation from Nationwide for the loss of its collateral, the Heidlers' home.

{¶ 13} On February 27, 2015, the Ohio Department of Commerce, Division of State Fire Marshal, received a subpoena from the Heidlers' trial counsel seeking any and all documents and materials that related to the fire marshal's investigation into the fire. Two weeks later, on March 11, 2015, the fire marshal moved to quash the subpoena alleging the subpoena sought confidential documents and materials that were part of its ongoing investigatory file that were not subject to disclosure to the Heidlers or to the public. The fire marshal based its claim, in part, on the so-called "law-enforcement investigatory privilege" that had first been promulgated by the Ohio Supreme Court in *Henneman v. Toledo*, 35 Ohio St.3d 241 (1988), and thereafter reaffirmed by the Ohio Supreme Court in *J&C Marketing, L.L.C. v. McGinty*, 143 Ohio St.3d 315, 2015-Ohio-1310.

{¶ 14} On May 4, 2015, the trial court ordered the fire marshal to file a privilege log that included a list of all documents and materials that it claimed were privileged and not subject to disclosure to the Heidlers and their trial counsel. Shortly thereafter, on May 29, 2015, the fire marshal filed its privilege log with the trial court. The privilege log identified photographs, video and audio recordings, a synopsis of witness interviews, witness statements, anonymous information the fire marshal had received about the fire, copies of information from other law enforcement agencies, and a draft investigation report that had

yet to be completed.  The fire marshal later delivered the documents and materials identified in its privilege log to the trial court for an in camera review.[4]  After conducting the necessary in camera review, the trial court issued a decision granting the fire marshal's motion to quash.[5]

### The Heidlers' Protective Order/Cease and Desist Order

**{¶ 15}** On December 18, 2015, the Heidlers moved the trial court for a protective order and, or in the alternative, a cease and desist order against Nationwide and Nationwide's trial counsel.  The Heidlers' motion was in reaction to a mass mailing one of Nationwide's trial counsel had sent to 17 potential fact witnesses on December 8, 2015.  The letter at issue contained Nationwide's trial counsel's law firm name followed by the following message:

> Please be advised that you have been listed as someone potentially having knowledge regarding the matter of *Nationwide v. Jonathan Heidler*, Clinton County Case NO. CVH20140532.  If at any time you feel that you have been threatened or intimidated in any way regarding this matter, please contact your local police department.  If you would like to discuss this matter further, you may contact me at your convenience.

**{¶ 16}** The Heidlers took exception to this letter claiming it violated Rules 4.1, 4.3, and 8.4 of the Ohio Rules of Professional Conduct regarding the truthfulness of statements to others, dealings with unrepresented persons, and general misconduct.  The Heidlers also

---

4. We note that around this time Nationwide appealed one of the many decisions issued by the trial court granting a motion to compel filed by the Heidlers that required Nationwide and Nationwide's trial counsel to answer interrogatories and turn over certain materials to the Heidlers.  This court's decision affirming in part and reversing in part the trial court's decision in that matter can be found in *Nationwide Agribusiness Ins. Co. v. Heidler*, 12th Dist. Clinton No. CA2015-07-013, 2016-Ohio-455.

5. The Heidlers appealed the trial court's decision granting the fire marshal's motion to quash.  This court, however, dismissed the Heidlers' appeal for lack of a final appealable order.  *See Nationwide Agribusiness Ins. Co. v. Heidler*, 12th Dist. Clinton No. CA2015-09-018 (Nov. 4, 2015) (Entry Granting Motion to Dismiss Appeal).

alleged that the letter itself was Nationwide's trial counsel's attempt to "intimidate" or "influence" any potential witnesses by making "false statements regarding potential harm to be directed toward the witness based upon an unspecified connection with the lawsuit referenced in the letter." The Heidlers further alleged that the letter "has the obvious and natural consequence of scaring witnesses" by "discouraging any voluntary participation in speaking with anyone concerning their potential knowledge of the facts of this case[.]" The Heidlers additionally alleged that the letter "casts false dispersions upon the parties involved in this litigation that they might engage in threatening or intimidating conduct toward these witnesses."

{¶ 17} On March 21, 2016, the trial court issued a decision finding that, based on the "spirit" of Rule 4.3 of the Ohio Rules of Professional Conduct, and in "fairness" to the Heidlers, Nationwide's trial counsel should have identified whom she and her law firm were representing within the body of the letter. The trial court also found that Nationwide's trial counsel should have disclosed the fact that Nationwide's "monetary interests were directly opposed to the monetary interests of all other parties."[6]

{¶ 18} To remedy these defects, the trial court ordered Nationwide's trial counsel to "mail to all the recipients of the December 8, 2015 letter a second letter that reference[d] the first letter" that (1) identified herself as Nationwide's trial counsel, (2) notify the recipient that her law firm was representing Nationwide, and (3) "clearly state that the monetary interests of [Nationwide] are directly opposed to the monetary interests of all the other parties in this pending action," including both the Heidlers and Wilmington Savings Bank.

---

6. Rule 4.3 of the Ohio Rules of Professional conduct prohibit a lawyer from stating or implying that the lawyer is disinterested in "dealing on behalf of a client with a person who is not represented by counsel."

The trial court also ordered Nationwide's trial counsel to send a copy of the letter "to all the parties on the same date it is mailed to the potential witnesses." The trial court concluded by noting that "[t]he issue of possible sanctions shall be addressed by the court at a later date."

{¶ 19} On April 4, 2016, Nationwide's trial counsel filed a notice of compliance with the trial court notifying it that she had complied with the trial court's directives as set forth above.[7] The second letter sent by Nationwide's trial counsel included the same basic identifying information contained in the first. The letter then set forth the following message:

> We represent the plaintiffs in the above referenced matter. This letter is a reminder that you have been listed as a potential witness. The lawsuit involves allegations by our clients, Nationwide Agribusiness Insurance Company and Nationwide Mutual Fire Insurance Company, that the defendant, Jonathan Heidler, may have been involved in causing his home to be burned in order to collect the insurance proceeds. Obviously, our client's economic interests are opposed to that of Mr. Heidler, as well as that of Wilmington Savings Bank and Cincinnati Insurance Company.
>
> As this case gets closer to trial, you may be contacted by one or more of the parties with respect to information you may have regarding Mr. Heidler or the claims in the case. If you have any questions or concerns in the meantime, please do not hesitate to contact us. Thank you very much for your attention to this.

{¶ 20} On May 5, 2016, the Heidlers moved the trial court to find Nationwide's trial counsel in contempt for violating the trial court's directives set forth above. The Heidlers supported this motion by claiming Nationwide failed to simultaneously mail a copy of the letter to all of the parties and did not specifically reference its earlier letter within the second. The Heidlers also alleged that Nationwide's letter was evidence of Nationwide's

---

7. We note that although 17 letters were originally sent by Nationwide's trial counsel to potential fact witnesses only 11 of those letters were actually received by those 17 potential witnesses.

impermissible attempt "to tamper with the witnesses and influence their view of [the] case" by "specifically stating that [Mr. Heidler] may have been involved in causing his home to be burned in order to collect the insurance proceeds."

{¶ 21} On June 1, 2016, the trial court issued a decision denying the Heidlers' motion for contempt requesting it find Nationwide's trial counsel in contempt for "failing to send a copy of the remedial letter at issue to counsel[.]" The trial court also denied the Heidlers' motion for contempt alleging that Nationwide's trial counsel was in contempt for using "defamatory statements in their remedial letter." The trial court, however, granted the Heidlers' motion for contempt upon finding Nationwide's trial counsel failed "to reference its December 8, 2015 letter in its remedial letter." Similar to its previous directive, the trial court concluded by again noting that "[s]anctions shall be considered at a future date."

### The Parties' Motions for Summary Judgment

{¶ 22} Beginning the week of October 20, 2016, the parties filed motions for summary judgment on some or all of their claims and defenses. Several months later, the trial court issued its decision finding a question of material fact remained as to the cause and origin of the fire; Nationwide claiming the fire was set intentionally by Howland whereas the Heidlers claimed the fire was merely an accident. According to the trial court, this created a genuine issue of material fact on Nationwide's declaratory judgment claim that needed to be resolved at trial. The trial court also determined that there was a genuine issue of material fact that needed to be resolved on Nationwide's and the Heidlers' competing breach of contract claims.[8] Upon denying Nationwide's motion for summary

---

8. The trial court addressed several other claims and defenses raised by both Nationwide and the Heidlers within this decision none of which are relevant to this appeal.

judgment, the trial court scheduled the matter for a jury trial to commence on May 8, 2018.

**The Final Pretrial and Jury Trial**

{¶ 23} On May 7, 2018, the day prior to the start of the jury trial, the trial court held a final pretrial hearing to address the parties' outstanding pretrial motions and "non-jury issues." This included several motions in limine, objections to the admissibility of certain evidence, jury questionnaires, and proposed jury instructions from both Nationwide and the Heidlers, among others. The trial court held this final pretrial hearing with the expectation that there would be no other pretrial "non-jury issues" that needed to be addressed prior to the start of trial, nor any need to stop either party from presenting their case "to rule on objections because somebody said object[.]" This includes whether any of the expert witnesses disclosed by either party – like Bensen, the certified fire investigator hired by Nationwide to investigate the cause and origin of the fire on the Heidlers' property – would be permitted to testify as an expert witness at trial. The final pretrial hearing lasted a full day and resulted in a lengthy transcript spanning nearly 300 pages.

{¶ 24} On May 8, 2018, the jury trial began and a jury was empaneled. Shortly thereafter, and just before Bensen took the stand as the first witnesses in Nationwide's case-in-chief, the Heidlers moved the trial court to hold a *Daubert* hearing to address whether Bensen was an expert who could testify as an expert witness at trial.[9] The trial court denied the Heidlers' motion as untimely given that all of the parties' pretrial motions were to be addressed at the final pretrial hearing held the day before. Specifically, as the trial court stated:

> All right. The Court is of the view that it does have the gatekeeping responsibility as it relates to Daubert issues.

9. A *Daubert* hearing is generally considered a prospective examination of the admissibility of an expert's testimony to determine whether the basis for the testimony is scientifically valid and reliable.

> But the Court is of the opinion, as I indicated in chambers, that the gate is pretty well closed at this point in time. This case – this fire happened four years ago.
>
> I do know Mr. Bensen's deposition was taken quite a few years ago. This issue has been out there, been able to be raised, * * * I wasn't advised until less than an hour ago [that this was an issue.]
>
> And these documents were filed, and we have already selected a Jury, are ready to begin opening statements, and as a result, it sounds as if it's a definite dispute as to whether or not any of the Daubert applications should be imposed.
>
> And at this late stage I'm not going to stop anything and take up that issue, so I'm going to deny the request to voir dire [Bensen].

The jury trial then proceeded as scheduled.

**{¶ 25}** The jury trial lasted eight days. During trial, the jury heard testimony from over 20 witnesses. This included expert testimony from Bensen regarding the cause and origin of the fire. Specifically, that the fire on the Heidlers' property was a "flash fire" that had two points of origin with a distinctive burn pattern, thereby indicating the fire was intentionally set through the use of an accelerant. When asked how certain he was that the fire was set intentionally, Bensen testified that based on his training and experience as a certified fire investigator that he was 100% certain that the fire that destroyed the Heidlers' home and Mr. Heidler's vehicle was a "flash fire" that was set intentionally.

**{¶ 26}** This also included testimony from Amber Rae Hawk. Responding to the Heidlers' claim that the fire was merely an accident, Hawk testified that Howland, the man Nationwide believed had intentionally set fire to the Heidlers' home, told her that he was upset that Mr. Heidler had not yet paid him the $10,000 he was owed for setting fire to the property. Specifically, as Hawk testified regarding her conversation with Howland shortly after the fire on the Heidlers' property occurred:

[Howland] said he was upset because [Mr. Heidler] had not paid him, finished paying him to [burn down his house], and he was angry at [Mr. Heidler] for not paying him to do it, he said, because he had done all the work that he wanted him to do and then [Mr. Heidler] didn't pay him for it.

**The Verdict and the Trial Court's Judgment**

{¶ 27} Following deliberations, the jury returned a verdict finding Nationwide had proved by a preponderance of the evidence that the Heidlers, either directly or indirectly, had intentionally caused the fire to their property. Due to this finding, the jury returned a verdict in favor of Nationwide and against the Heidlers that granted Nationwide a declaratory judgment finding the losses caused to the Heidlers' property and Mr. Heidler's vehicle were not "covered" loses under either of the two insurance policies it had issued to Mr. Heidler. The trial court subsequently entered its judgment confirming the jury's verdict on May 24, 2018.

**Proceedings Following the Trial Court's Judgment**

{¶ 28} On June 20, 2018, Nationwide filed a notice of appeal from the trial court's judgment. The following day, June 21, 2018, the Heidlers moved the trial court for judgment notwithstanding the verdict under Civ.R. 50(B), or in the alternative, for a new trial under Civ.R. 59(A). Shortly thereafter, on July 2, 2018, the Heidlers filed their own notice of appeal. Because the Heidlers' had filed their motion for judgment notwithstanding the verdict, or alternatively, for a new trial prior to filing their notice of appeal, this court remanded the matter to the trial court to issue a decision on that motion. *See Nationwide Agribusiness Ins. Co. v. Heidler*, 12th Dist. Clinton No. CA2018-06-003 (July 23, 2018) (Entry Remanding Appeal). Approximately one month later, on August 20, 2018, the trial court issued a decision denying the Heidlers' motion in its entirety. The matter was then returned to this court and submitted for review on September 3, 2019.

- 14 -

## Appeal

{¶ 29} Both Nationwide and the Heidlers appeal from the trial court's judgment, collectively raising eight assignments of error for review; two assignments of error raised by Nationwide and six cross-assignments of error by the Heidlers. Nationwide has also raised five "conditional" cross-assignments of error for review. For ease of discussion, we will address Nationwide's two assignments of error first followed by the six cross-assignments of error raised by the Heidlers. Following this discussion, we will then briefly address Nationwide's five "conditional" cross-assignments of error.

## Nationwide's Appeal

{¶ 30} Nationwide's Assignment of Error No. 1:

{¶ 31} THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ORDERED NATIONWIDE TO SEND CERTAIN COMMUNICATIONS TO THIRD PARTIES (MARCH 21, 2016), AND WHEN IT ISSUED SANCTIONS RELATED TO THOSE COMMUNICATIONS.

{¶ 32} In its first assignment of error, Nationwide challenges the trial court's June 1, 2016 decision finding its trial counsel in contempt for disobeying the trial court's directives regarding the "remedial letter." The trial court, however, has yet to impose any penalty or sanction on Nationwide or Nationwide's trial counsel resulting from this contempt finding. A trial court's decision finding a party in contempt is a final appealable order only after "the court has imposed a penalty or sanction." *Dudley v. Dudley*, 12th Dist. Butler No. CA2012-04-074, 2013-Ohio-859, ¶ 10, discretionary appeal not allowed, 136 Ohio St.3d 1451, 2013-Ohio-3210. That is to say, "[b]efore a finding of contempt of court constitutes a final appealable order, two elements must exist: (1) a finding of contempt, and (2) the imposition of a penalty or sanction." *Hetterick v. Hetterick*, 12th Dist. Brown No. CA2012-02-002,

- 15 -

2013-Ohio-15, ¶ 13, citing *State ex rel. Doe v. Tracy*, 51 Ohio App.3d 198 (12th Dist.1988);

*MD Acquisition, LLC v. Myers*, 10th Dist. Franklin No. 11AP-390, 2013-Ohio-3825, ¶ 24

("the general rule for contempt proceedings is that a judgment of contempt becomes a final

appealable order only when there is both a finding of contempt and the imposition of a

penalty"); *Koeppen v. Swank*, 12th Dist. Butler No. CA2008-09-234, 2009-Ohio-3675, ¶ 20,

quoting *Chain Bike v. Spoke 'N Wheel, Inc.*, 64 Ohio App.2d 62, 64 (8th Dist.1979) ("[t]he

mere adjudication of contempt is not final until a sanction is imposed").  Therefore, because

the trial court has yet to impose any penalty or sanction on Nationwide or Nationwide's trial

counsel resulting from this finding of contempt, the appeal of the trial court's June 1, 2016

entry is dismissed for lack of a final appealable order.[10]

{¶ 33} Nationwide's Assignment of Error No. 2:

{¶ 34} THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ISSUED MONETARY SANCTIONS AGAINST NATIONWIDE RELATED TO DISCOVERY RESPONSES.

{¶ 35} In its second assignment of error, Nationwide argues the trial court erred by ordering it to pay a portion of attorney fees the Heidlers incurred to compensate their trial counsel for work done to enforce one of the trial court's many discovery orders.[11]  The trial

---

10. Despite the language used in its first assignment of error, we note that Nationwide acknowledges that "to date" the trial court has not imposed any penalty or sanction on Nationwide or its trial counsel resulting from this contempt finding.  The fact that a penalty or sanction may be imposed at a later date does not transform an otherwise non-final appealable order into an order that is final and appealable.  Neither does the fact that the Heidlers represented to the trial court that Nationwide had been "sanctioned" in their subsequent pleadings.

11. Due to the contentious nature of these proceedings, the record contains numerous discovery motions, hearings on those motions, and discovery orders issued by the trial court on those motions.  This assignment of error is based on the Heidlers' April 13, 2015 motion to compel discovery and the Heidlers' subsequent June 3, 2016 motion to enforce the trial court's corresponding discovery order.  The trial court held a hearing on the matter on November 20, 2017 and thereafter issued a decision on February 8, 2018 awarding attorney fees to the Heidlers in the amount of $5,000 plus interest, an amount that was $6,936.92 less than what the Heidlers had requested.

court, however, failed to provide a basis for the amount of attorney fees that it awarded. This includes the trial court's decision to award only a portion of the attorney fees the Heidlers' requested without providing an explanation as to the reduction of the fees. Under these circumstances, we find it necessary to vacate the award of attorney fees and remand this matter for the trial court to reconsider the award of attorney fees and the amount of attorney fees, if any, that should be awarded. *See generally Levy v. Seiber*, 12th Dist. Butler Nos. CA2015-02-019, CA2015-02-021, and CA2015-02-030, 2016-Ohio-68, ¶ 65-71 (vacating an award of attorney fees and remanding matter to the trial court to consider anew an award of attorney fees based upon the record before it). Upon conducting such a review, the trial court shall make the necessary findings to enable this court to conduct a meaningful review should that decision again be appealed. *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991) ("the trial court must state the basis for the fee determination" to enable an appellate court to conduct a meaningful review). Therefore, to the extent outlined above, Nationwide's second assignment of error is sustained and the trial court's decision is reversed and remanded for further proceedings.

**The Heidlers' Cross-Appeal**

{¶ 36} The Heidlers' Assignment of Error No. 1:

{¶ 37} THE TRIAL COURT ERRED IN GRANTING THE STATE FIRE MARSHAL'S MOTION TO QUASH THE HEIDLERS' SUBPOENA FOR ITS FILE.

{¶ 38} In their first assignment of error, the Heidlers argue the trial court erred by granting the fire marshal's motion to quash. We disagree.

{¶ 39} "A trial court's decision on a motion to quash a subpoena generally is reviewed for an abuse of discretion." *Donlon v. Lineback*, 12th Dist. Warren Nos. CA2016-03-015 and CA2016-03-016, 2016-Ohio-7739, ¶ 44, citing *Battelle Mem. Inst. v. Big Darby Creek*

- 17 -

*Shooting Range*, 192 Ohio App.3d 287, 2011-Ohio-793, ¶ 38 (12th Dist.). The motion to quash at issue in this case, however, involves the application of the so-called "law-enforcement investigatory privilege" that was recognized by the Ohio Supreme Court in *Henneman*, 35 Ohio St.3d 241, and thereafter reaffirmed by the Ohio Supreme Court in *McGinty*, 143 Ohio St.3d 315, 2015-Ohio-1310. A de novo standard of review therefore applies. *See Autumn Health Care of Zanesville, LLC v. Dewine*, 10th Dist. Franklin No. 14AP-593, 2015-Ohio-2655, ¶ 12 ("[b]ecause the motion to quash required the trial court to interpret and apply this privilege as defined in *Henneman* and subsequent court decisions, it involved a question of law, and we review the trial court's decision under the de novo standard of review"); *see also Carter v. Gestalt Inst. of Cleveland*, 8th Dist. Cuyahoga No. 99738, 2013-Ohio-5748, ¶ 18.

{¶ 40} "The common law recognizes a qualified privilege for law-enforcement investigatory information, including confidential sources, surveillance information, and law-enforcement techniques and procedures." *McGinty*, 2015-Ohio-1310 at ¶ 17. But the law-enforcement investigatory privilege is not absolute. *Id.* at ¶ 2. There is instead a balancing test that must be applied "for weighing the interests of law enforcement in keeping the information confidential against the needs of a civil litigant who requests the information in discovery." *Id.* This balancing test is applied in order to adhere to the "'fundamental requirements of fairness'" so that "when the privileged information 'is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.'" *Id.* at ¶ 18, quoting *Roviaro v. United States*, 353 U.S. 53, 60-61, 77 S.Ct. 623 (1957). The factors applied in this balancing test are as follows:

> (1) The extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information;

- 18 -

(2) The impact upon persons who have given information of having their identities disclosed;

(3) The degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure;

(4) Whether the information sought is factual data or evaluative summary;

(5) Whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question;

(6) Whether the police investigation has been completed;

(7) Whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation;

(8) Whether the plaintiff's suit is non-frivolous and brought in good faith;

(9) Whether the information sought is available through other discovery or from other sources; and

(10) The importance of the information sought to the plaintiff's case.

*McGinty*, 2015-Ohio-1310 at ¶ 19, quoting *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D.Pa.1973).

{¶ 41} When applying this balancing test there is a "strong presumption" against lifting the privilege. *Id.* at ¶ 18, citing *In re New York City*, 607 F.3d 923, 299 (2d Cir.2010). The party seeking the investigatory law-enforcement investigatory material may obtain that material "only upon showing a 'compelling need.'" *Id.* That is to say, "information related to a law-enforcement investigation is protected from disclosure in civil litigation unless the party seeking discovery demonstrates that it has a compelling need for the information and that that need outweighs the public's interest in keeping the information confidential." *McGinty* at ¶ 22. The balancing test is therefore used "to determine whether the privilege

applies, weighing the legitimate public interest in the confidentiality of the information versus the needs of a litigant to obtain evidence in support of a non-frivolous cause of action." *Autumn Health Care*, 2015-Ohio-2655 at ¶ 14, citing *Id.* at ¶ 19. "[T]he most appropriate method of conducting the balancing test is through an in camera review of the documents allegedly subject to the privilege." *Id.*, citing *Henneman*, 35 Ohio St.3d at 242.

{¶ 42} This court has reviewed the fire marshal's investigatory file that the trial court found was protected by the law-enforcement investigatory privilege. Upon review, we find no error in the trial court's decision to grant the fire marshal's motion to quash. We reached this decision after fully complying with the applicable de novo standard of review, which requires this court to independently review the record and come to our own conclusion regarding the applicability of the law-enforcement investigatory privilege without affording any deference to the trial court's decision. *See Holt v. State*, 10th Dist. Franklin No. 10AP-214, 2010-Ohio-6529, ¶ 9 ("[d]e novo appellate review means that the court of appeals independently reviews the record and affords no deference to the trial court's decision"). Due to the privileged nature of its contents, we find any further discussion as it relates to the specific exhibits contained within the SFM's investigatory file would be improper and otherwise thwart the public's interest in keeping that information confidential and protected from disclosure. Therefore, finding no error in the trial court's decision granting the fire marshal's motion to quash, the Heidlers' first assignment of error lacks merit and is overruled.

{¶ 43} The Heidlers' Assignment of Error No. 2:

{¶ 44} THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF NATIONWIDE'S FIRE CAUSE AND ORIGIN WITNESS THOMAS BENSEN.

{¶ 45} In their second assignment of error, the Heidlers argue the trial court erred by

- 20 -

allowing Nationwide's expert witness, Thomas Bensen, to testify regarding the cause and origin of the fire. We disagree.

{¶ 46} Trial courts have broad discretion in determining the admissibility of expert testimony. *Estate of Smith v. W. Brown Local Sch. Dist.*, 12th Dist. Brown No. CA2014-06-012, 2015-Ohio-154, ¶ 33. Given its broad discretion on matters involving the admissibility of expert testimony, "[a] trial court's decision on whether to admit or exclude expert testimony will not be reversed absent an abuse of discretion." *Herzner v. Fischer Attached Homes, Ltd.*, 12th Dist. Clermont No. CA2007-08-090, 2008-Ohio-2261, ¶ 7, citing *State v. Jones*, 90 Ohio St.3d 403, 414 (2000). An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment. *Madison Cty. Bd. of Commrs. v. Bell*, 12th Dist. Madison No. CA2005-09-036, 2007-Ohio-1373, ¶ 30. "A decision is unreasonable where it is not supported by a sound reasoning process." *Colosseo USA, Inc. v. Univ. of Cincinnati*, 1st Dist. Hamilton No. C-180223, 2019-Ohio-2026, ¶ 16, citing *Waldman v. Pitcher*, 1st Dist. Hamilton Nos. C-150462 and C-150501, 2016-Ohio-5909, ¶ 17.

{¶ 47} The Heidlers initially argue that the trial court erred by refusing to conduct a *Daubert* hearing to determine the admissibility of Bensen's expert testimony at trial. The Heidlers, however, moved the trial court to hold a *Daubert* hearing (1) after the trial court held a final pretrial hearing to address any and all of the parties' pretrial motions then pending and (2) after the jury had already been empaneled just prior to when Bensen was called to testify as part of Nationwide's case-in-chief. Given the late nature of the filing, we find no error in the trial court's decision denying the Heidlers' motion requesting the trial court hold a *Daubert* hearing as untimely. *See, e.g., Feliciano-Hill v. Principi*, 439 F.3d 18, 24 (1st Cir.2006) (lower court was on "firm ground" by refusing to conduct a *Daubert* hearing

where the motion requesting that hearing was untimely); *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir.2004) ("[a] *Daubert* objection not raised before trial may be rejected as untimely"). This is because *Daubert* contemplates a "gatekeeping" function not a "gotcha" function. *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1087 (10th Cir.2003). The Heidlers' claim otherwise lacks merit.

{¶ 48} Although forfeiting their ability to challenge the admissibility of Bensen's expert testimony prior to trial via a *Daubert* hearing, the Heidlers nevertheless argue that the trial court erred by allowing Bensen to testify as an expert witness since his expert opinion regarding the cause and origin of the fire was not based on a "reliable" scientific information. We find no merit to the Heidlers' claim.

{¶ 49} Pursuant to Evid.R. 702(C), a witness may testify as an expert witness if the "witness' testimony is based on reliable scientific, technical, or other specialized information." To the extent that the expert witness' testimony reports the result of a procedure, test, or experiment, the expert's testimony is "reliable" only if the requirements set forth in Evid.R. 702(C)(1) thru (3) are met. Those requirements are as follows:

> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
>
> (2) The design of the procedure, test, or experiment reliably implements the theory;
>
> (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶ 50} This requires the focus to be on "whether the principles and methods the expert employed to reach his [or her] opinion are reliable, rather than whether the conclusions are correct." *State Farm Fire & Cas. Co. v. Holland*, 12th Dist. Madison No. CA2007-08-025, 2008-Ohio-4436, ¶ 21, citing *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607,

611 (1998).

{¶ 51} The Heidlers' argument is based on their reading and interpretation of the National Fire Protection Association's Publication 921, *Guide for Fire and Explosion Investigations* ("NFPA 921"). Relying on the NFPA 921, the Heidlers argue that the trial court erred by allowing Bensen to testify that the fire on the Heidlers' property was intentionally set through the use of an accelerant since Bensen's expert opinion was based on burn pattern rather than on laboratory testing of fire debris taken from the property. This, according to the Heidlers, renders Bensen's expert opinion regarding the cause and origin of the fire inadmissible under Evid.R. 702(C) since it was based on unreliable scientific information in conflict with the requirements set forth in the NFPA 921.

{¶ 52} But, contrary to the Heidlers' claim, it is now generally well-established that the NFPA 921 does not require an expert witness "to perform physical experiments as a prerequisite to offering his [or her] testimony in court" regarding the cause and origin of a fire. *AmGuard Ins. Co. v. Fire Sys. of Mich.*, E.D.Mich. No. 18-11952, 2019 U.S. Dist. LEXIS 127176, *12 (July 31, 2019); *see, e.g., Shuck v. CNH Am., LLC*, 498 F.3d 868, 875, fn. 3 (8th Cir.2007) (no "bright line rule that expert opinions in fire cases always must be supported by testing to be admissible"); *Erie Ins. Co. v. Sunbeam Prods., Inc.*, S.D. Ohio No. 12-CV-00703, 2015 U.S. Dist. LEXIS 2437, *17 (Jan. 8, 2015) (although expert "did not perform physical experiments to test his hypothesis, NFPA 921 specifically provides that testing is done by the principle of deductive reasoning"); *Travelers Indem. Co. v. Indus. Paper & Packaging Corp.*, E.D.Tenn. No. 3:02-CV-491, 2006 U.S. Dist. LEXIS 43851, *14-*15 (June 27, 2006) (permitting an expert witness to testify regarding the cause and origin of a fire even though the witness had not performed any physical testing).

{¶ 53} It is also generally well established that the "failure to strictly adhere to NFPA

921 does not render an investigation per se unreasonable." *Pekarek v. Sunbeam Prods., Inc.*, 672 F. Supp. 2d 1161, 1175 (D.Kan.2008). This is because the "NFPA 921 does not mandate strict compliance with its provisions, including adherence to the scientific method."[12] *AmGuard* at *10, citing *Alford v. Allstate Ins. Co.*, E.D.Mich. No. 12-CV-14238, 2013 U.S. Dist. LEXIS 202586, *6 (July 8, 2013) ("NFPA 921 itself states, it is merely a guide for investigators, and it includes only nonmandatory provisions"); *See* NFPA 921 Section 1.2 (the purpose of the NFPA 921 "is to establish guidelines and recommendations for the safe and systematic investigation or analysis of fire and explosion incidents").

{¶ 54} Such a failure instead goes to the weight of the expert witness' testimony regarding the cause and origin of the fire and not to the admissibility of that testimony. *See, e.g., Donegal Mut. Ins. V. White Consol. Indus.*, 166 Ohio App.3d 569, 2006-Ohio-1586, ¶ 54 (2d Dist.) (that a fire investigator did not perform any physical testing prior to offering his expert opinion on the cause and origin of a fire went to the weight of the testimony and not to its admissibility); and *People v. Jackson*, Mich.App. No. 272776, 2008 Mich.App. LEXIS 958, *3-*4 (May 13, 2008) (expert witness' opinion that a fire was intentionally set with an accelerant was reliable and therefore admissible even though "it was contrary to laboratory results indicating the absence of an accelerant" as "[s]uch criticisms go to the weight rather than the admissibility of the testimony").

{¶ 55} The NFPA 921 also does not prohibit a fire investigator from relying on burn patterns to determine the cause and origin of a fire. The NFPA 921 instead "only cautions

---

12. The Heidlers argue that even though the NFPA 921 uses the term "should" rather than "shall" that this "does not render a confirming laboratory analysis merely discretionary." This is simply not true. The use of the term "shall" is considered mandatory, whereas the use of the term "should" is merely advisable. *See Webb v. Edwards*, 165 Ohio App.3d 158, 2005-Ohio-6379, ¶ 23 (4th Dist.) (discussing the meaning of the terms "shall," "should," and "may" when interpreting the standards set forth in the Ohio Manual of Uniform Traffic Control Devices).

an investigator from considering burn patterns alone." *Thompson v. State Farm Fire & Cas. Co.*, 548 F. Supp. 2d 588, 592 (W.D.Tenn.2008). Despite the Heidlers' claims, the record indicates Bensen did not rely solely on burn patterns to determine the cause and origin of the fire on the Heidlers' property. Bensen instead examined the entire scene where the fire occurred, took numerous photographs (including overhead drone footage), collected evidence regarding potential causes of the fire (for example, a kerosene heater), preserved samples from the scene of the fire, and spoke to witnesses regarding their observations of the fire (including Mr. Heidler), all of which was then subject to a peer review. This is more than enough evidence to find Bensen's expert opinion on the cause and origin of the fire "reliable" and therefore admissible under Evid.R. 702(C). *See, e.g., Gaskin v. Sharp Elecs. Corp.*, N.D.Ind. No. 2:05-CV-303, 2007 U.S. Dist. LEXIS 65532, at *5 (Aug. 31, 2007) (finding expert witness' opinion regarding the cause and origin of a fire reliable where the expert witness conducted an onsite investigation, took photographs, and analyzed fire burn patterns). Therefore, finding no merit to any of the arguments raised by the Heidlers herein, the Heidlers' second assignment of error is overruled.

{¶ 56} The Heidlers' Assignment of Error No. 3:

{¶ 57} THE MISCONDUCT OF NATIONWIDE'S COUNSEL IN MAKING IMPROPER EXPRESS STATEMENTS OF AN EARLIER HOUSE FIRE AND OTHER INSURANCE CLAIMS INVOLVING MR. HEIDLER ENTITLES THE HEIDLERS TO A NEW TRIAL.

{¶ 58} In their third assignment of error, the Heidlers argue they are entitled to a new trial based on Nationwide's alleged misconduct at trial when it defied the trial court's order by commenting on an earlier house fire on the Heidlers' property and other prior insurance claims involving the Heidlers and their property. The Heidlers, however, did not raise this

issue as part of their motion for a new trial. "It is well-established that a party cannot raise new issues or legal theories for the first time on appeal." *Cox v. Zimmerman*, 12th Dist. Clermont No. CA2011-03-022, 2012-Ohio-226, ¶ 17, citing *Hamilton v. Digonno*, 12th Dist. Butler No. CA2005-03-075, 2005-Ohio-6552, ¶ 20; *Am. Econ. Ins. Co. v. Pryor*, 12th Dist. Clermont No. CA95-03-019, 1995 Ohio App. LEXIS 3009, *6 (July 17, 1995) ("[i]t is well-settled that matters not raised and argued at the trial court level may not be raised for the first time on appeal"). Therefore, because this issue was not raised by the Heidlers in their motion for a new trail, we need not consider this issue for the first time on appeal. *See, e.g., A N Bros. Corp. v. Total Quality Logistics, LLC*, 12th Dist. Clermont No. CA2015-02-021, 2016-Ohio-549, ¶ 43 (argument advanced by appellant requesting a judgment be reversed and remanded for a new trial was waived where that argument was not raised as part of appellant's motion for a new trial). The Heidlers' claim otherwise lacks merit.

{¶ 59} Regardless, even assuming the Heidlers had raised this issue as part of their motion for a new trial, our review of the record indicates Nationwide's comments were innocuous and had little, if any, impact on the jury's verdict. This is undoubtably the case here when considering the Heidlers did not object to many of those comments, and when they did object, the Heidlers' objections were sustained by the trial court. The trial court then instructed the jury to disregard any "[s]tatements or answers ordered stricken" or "to which the court sustained an objection[.]" The trial court also instructed the jury that they must neither "guess why the court sustained the objection to any questions [or] what the answer to each question might have been" nor "consider as evidence any suggestion included in a question that was not answered." "A jury is presumed to have properly followed instructions given by a trial court." *Silver v. Jewish Home of Cincinnati*, 190 Ohio App.3d 549, 2010-Ohio-5314, ¶ 41 (12th Dist), citing *Pang v. Minch*, 53 Ohio St.3d 186,

- 26 -

195 (1990). Therefore, finding no merit to any of the Heidlers' claims raised herein, the Heidlers' third assignment of error is overruled.

{¶ 60} The Heidlers' Assignment of Error No. 4:

{¶ 61} THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF NATIONWIDE'S "REBUTTAL" WITNESS AMBER RAE HAWK.

{¶ 62} In their fourth assignment of error, the Heidlers argue the trial court erred by allowing Nationwide's witness, Amber Rae Hawk, to testify at trial since she was an undisclosed witness that was not included on Nationwide's witness list. We disagree.

{¶ 63} As the record indicates, Hawk was called to testify by Nationwide for the sole purpose of rebutting the testimony given by another witness, Ronald Howland, that Howland had never told her that he was upset that Mr. Heidler had not yet paid him $10,000 for setting the fire on the Heidlers' property. An appellate court reviews a trial court's decision to allow the testimony of an undisclosed witness under an abuse of discretion standard. *Earley v. Earley*, 12th Dist. Clinton No. CA2012-01-001, 2012-Ohio-4772, ¶ 37, citing *Kallergis v. Quality Mold, Inc.*, 9th Dist. Summit Nos. 23651 and 23736, 2007-Ohio-6047, ¶ 14. We find no abuse of discretion here. The Heidlers knew of Hawk and what Hawk would testify to at trial if she were called as a witness years prior to when the jury trial began. Therefore, regardless of whether Hawk should be classified as a "rebuttal" witness or not, the trial court did not abuse its discretion by allowing Hawk to testify at trial. Accordingly, because we find no abuse of discretion in the trial court's decision, the Heidlers' fourth assignment of error lacks merit and is overruled.

{¶ 64} The Heidlers' Assignment of Error No. 5:

{¶ 65} THE CUMULATIVE PREJUDICIAL EFFECT OF ALL ERRORS ADVANCED BY THE HEIDLERS WARRANTS A REVERSAL OF THE TRIAL COURT'S JUDGMENT

- 27 -

AND A NEW TRIAL.

{¶ 66} In their fifth assignment of error, the Heidlers argue the trial court's judgment should be reversed under the "cumulative error" doctrine. Although this court has no issue applying the cumulative error doctrine in criminal cases, this court has previously noted its reluctance to apply the cumulative error doctrine in civil cases. *See Allen v. Summe*, 12th Dist. Butler No. CA92-04-067, 1993 Ohio App. LEXIS 2553, *3 (May 17, 1993) ("[t]his court is somewhat reluctant to apply the cumulative error doctrine in civil cases"). However, even setting aside this court's reluctance to apply the cumulative error doctrine in civil cases, in order for the cumulative error doctrine to apply "an appellate court must find that multiple errors, none of which individually rose to the level of prejudicial error, actually occurred in the trial court." *State v. Cramer*, 12th Dist. Butler No. CA2003-03-078, 2004-Ohio-1712, ¶ 67, citing *State v. DeMarco*, 31 Ohio St.3d 191, 197 (1987). No such error, harmless or otherwise, occurred here. Therefore, because this court has found no merit to any of the Heidlers' assignments of error discussed above, the Heidlers cannot demonstrate cumulative error. Accordingly, finding the cumulative error doctrine inapplicable to the case at bar, the Heidlers' fifth assignment of error lacks merit and is overruled.

{¶ 67} The Heidlers' Assignment of Error No. 6:

{¶ 68} THE TRIAL COURT ERRED IN DENYING THE HEIDLERS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT, OR IN THE ALTERNATIVE, FOR NEW TRIAL.

{¶ 69} In their sixth assignment of error, the Heidlers argue the trial court erred by denying their motion for judgment notwithstanding the verdict or, alternatively, their motion for a new trial. We disagree.

{¶ 70} A motion requesting a judgment notwithstanding the verdict is governed by

Civ.R. 50(B). *Coyne v. Stapleton*, 12th Dist. Clermont No. CA2006-10-080, 2007-Ohio-6170, ¶ 9. A motion for a judgment notwithstanding the verdict brought pursuant to that rule tests the legal sufficiency of the evidence. *Brown v. Taylor*, 12th Dist. Butler No. CA2015-11-199, 2016-Ohio-5180, ¶ 9. This is the same standard used to test a motion for a directed verdict. *McHenry v. Terry Materials*, 12th Dist. Butler No. CA2002-03-053, 2003-Ohio-1063, ¶ 19, citing *Nickell v. Gonzalez*, 17 Ohio St.3d 136, 137 (1985), citing *Ayers v. Woodard*, 166 Ohio St. 138 (1957), paragraph one of the syllabus. A favorable ruling on a motion requesting a judgment notwithstanding the verdict "is not easily obtained[.]" *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986). This is because the motion must be denied "where any evidence of substantial probative value favors the nonmoving party, and reasonable minds might reach different conclusions on that evidence." *Faieta v. World Harvest Church*, 10th Dist. Franklin No. 08AP-527, 2008-Ohio-6959, ¶ 7, citing *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679 (1998); and *Strother v. Hutchinson*, 67 Ohio St.2d 282, 284-285 (1981).

{¶ 71} "We review a trial court's decision on a motion for directed verdict or judgment notwithstanding the verdict de novo." *Briggs v. Franklin Pre-Release Ctr.*, 12th Dist. Madison No. CA2013-10-035, 2014-Ohio-2477, ¶ 8, citing *Citibank, N.A. v. Ebbing*, 12th Dist. Butler No. CA2012-12-252, 2013-Ohio-4761, ¶ 52. As noted above, de novo review means that this court uses the same standard the trial court should have used. *Carter v. Reese*, 12th Dist. Butler No. CA2014-04-095, 2014-Ohio-5395, ¶ 11. "Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling on a motion for judgment notwithstanding the verdict." *Stewart v. Vivian*, 12th Dist. Clermont No. CA2015-05-039, 2016-Ohio-2892, ¶ 106. The evidence must nevertheless be construed most strongly in favor of the nonmoving party. *Cropper v. Jewell*, 12th Dist.

Clermont No. CA2008-09-088, 2009-Ohio-3683, ¶ 7; *Phipps v. Internatl. Paper Co.*, 12th Dist. Clinton No. CA2013-02-003, 2013-Ohio-3994, ¶ 11 ("[w]hen reviewing a motion requesting a judgment notwithstanding the verdict the evidence must be construed most strongly in favor of the party against whom the motion is made").

{¶ 72} A motion for a new trial is governed by Civ.R. 59(A). Pursuant to that rule, a new trial may be granted upon several enumerated grounds. These grounds include circumstances where there was an "irregularity in the proceedings of the court * * * or abuse of discretion, by which an aggrieved party was prevented from having a fair trial." Civ.R. 59(A)(1). These grounds also include circumstances where the judgment is contrary to law or where there was "[e]rror of law occurring at the trial and brought to the attention of the trial court by the party making the application." Civ.R. 59(A)(7) and (9). A motion for a new trial under Civ.R. 59(A)(1) is reviewed under an abuse of discretion standard. *Koerper v. Szabo*, 10th Dist. Franklin No. 18AP-734, 2019-Ohio-3159, ¶ 7. A motion for a new trial brought under either Civ.R. 59(A)(7) or (9) is reviewed de novo. *Harrison v. Horizon Women's Healthcare, LLC*, 2d Dist. Montgomery No. 28154, 2019-Ohio-3528, ¶ 11.

{¶ 73} The Heidlers argue the trial court erred by denying their motion requesting a judgment notwithstanding the verdict or, alternatively, their motion for a new trial due to the trial court's improper admission of Bensen's and Hawk's trial testimony. However, as discussed more fully above under the Heidlers' second and forth assignments of error, the trial court did not err by admitting either Bensen's or Hawk's testimony. This holds true regardless of whether the trial court may have applied the wrong standard of review when ruling on the Heidlers' motion. This court applies either an abuse of discretion or de novo standard of review when ruling on the specific arguments raised by the Heidlers in their motion. Under either standard of review, abuse of discretion or de novo, the Heidlers' claims

alleging the trial court erred by denying their motion fails. Therefore, because the trial court did not err by admitting either Bensen's or Hawk's testimony, the Heidlers' argument alleging they are entitled to a judgment notwithstanding the verdict on that basis lacks merit. So too does the Heidlers' alternative argument alleging the trial court erred by denying their motion for a new trial. Accordingly, finding no merit to any of the arguments raised by the Heidlers herein, the Heidlers' sixth assignment of error is overruled.

### Nationwide's Five "Conditional" Cross-Assignments of Error

{¶ 74} Nationwide advanced an additional five "conditional" cross-assignments of error for review. Nationwide conditioned these five cross-assignments of error on whether this court reversed or modified some part of the jury's verdict and trial court's judgment rendered in its favor. Specifically, as Nationwide stated in its initial appellate brief, "this Court need only consider [its five "conditional" cross-assignments of error] should [this Court] reverse or modify some part of the jury's verdict in Nationwide's favor." Given our holding in this case, Nationwide's five "conditional" cross-assignments of error are dismissed as moot.

### Conclusion

{¶ 75} Nationwide's appeal from the trial court's decision finding it's trial counsel in contempt is dismissed for a lack of a final appealable order since the trial court has yet to impose any penalty or sanction on Nationwide or Nationwide's trial counsel resulting from that contempt finding. Nationwide's appeal from the trial court's decision ordering it to pay the Heidlers' attorney fees for its failure to obey one of the many discovery orders issued by the trial court is reversed and remanded so that the trial court may provide a basis for awarding the amount of attorney fees that it did. In all other respects, the trial court's judgment is affirmed.

**{¶ 76}** Judgment dismissed in part, affirmed in part, reversed in part, and remanded to the trial court for further proceedings.

HENDRICKSON, P.J., and M. POWELL, J., concur.